IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* **PATRICIA SHEARER** <br> 320 Starlight Place <br> Lutherville, MD 21093, <br><br> **Plaintiff,** <br><br> v. <br><br> **UNIVERSITY OF MARYLAND SCHOOL OF MEDICINE** <br> 655 West Baltimore Street <br> Baltimore, MD 21201 <br><br> and <br><br> **UNIVERSITY OF MARYLAND MEDICAL CENTER** <br> 22 South Greene Street <br> Baltimore, MD 21201 <br><br> and <br><br> **UNIVERSITY OF MARYLAND FACULTY PHYSICIANS, INC.** <br> 250 W. Pratt Street <br> Suite 902 <br> Baltimore, Maryland 21201 <br><br> **Defendants.** | Case No. _____ <br><br> **COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C §§ 3729,** *ET SEQ.* <br><br><br> <u>**FILED UNDER SEAL**</u> <br><br><br> **JURY TRIAL DEMANDED** |

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

## INTRODUCTION

1.  Qui tam relator Doctor Patricia Shearer ("Dr. Shearer"), by her attorneys, individually
    and on behalf of the United States of America, files this complaint against Defendants
    University of Maryland School of Medicine ("UMDSoM"), University of Maryland
    Medical Center ("UMMC"), and University of Maryland Faculty Physicians, Inc. ("FPI")
    (collectively "Defendants") to recover damages, penalties, and attorneys' fees for
    violations of the federal False Claims Act, 31 U.S.C. §§ 3729 et seq., ("FCA" or "False
    Claims Act").  Shearer also seeks damages and attorneys' fees for unlawful retaliation in
    violation of 31 U.S.C. § 3730(h).

2.  Defendants submitted or caused to be submitted to Medicaid and Medicare claims
    containing upcoded bills, or bills that exaggerate the level of services provided, such as
    when it submitted bills containing extended times codes that did not satisfy the codes'
    face-to-face patient requirement and utilizing complicated patient codes not used in
    certain Departments, which violates the False Claims Act.

3.  Defendants submitted or caused to be submitted to Medicaid and Medicare claims for
    non-reimbursable services, such as when it submitted bills that improperly "added on"
    reviews prior to or following patient visits, which violates the False Claims Act.

4.  Due to Defendant's false claim submissions to Medicaid and Medicare, the Federal
    Government paid out nearly $16 million, which it would otherwise not have paid.

5.  Dr. Shearer, who began working at the UMMC in July 2011, reported these improper
    billing practices to the UMDSoM Billing and Compliance Offices.  After doing so,
    Doctor Steven Czinn ("Dr. Czinn"), Chairman of Pediatrics, fired Dr. Shearer in June

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

2012.  In order to comply with a contractual notification requirement, Dr. Czinn extended

Dr. Shearer's termination date, but relegated her to research at home, forbidding her from

fulfilling her clinical duties at the Children's Hospital.

6.  Dr. Shearer appealed her termination, and alerted UMD officials of her whistleblowing

actions and the subsequent retaliation against her.  She also disclosed the potential for

these non-compliant billing practices to be widespread throughout UMDSoM.

7.  After notifying the UMD President, Dean, and Chancellor, among others, the

Chancellor's Office referred this matter to the Maryland Attorney General ("MD AG")

and the University System of Maryland Internal Audit ("Internal Audit").  Dr. Shearer

communicated with Internal Audit and provided additional information regarding these

improper coding and billing methods.

8.  While the Internal Audit and MD AG investigations were still ongoing, Dr. Czinn

reaffirmed Dr. Shearer's termination date of September 12, 2012.

9.  Generation of relative value units ("RVUs"), which are used to measure the dollar

amount of patient charges, remains the focus at UMDSoM and UMMC, and clinical

revenues continue to grow at a significant rate while patient volumes increase at

approximately half that rate.  The non-compliant, overbilling practices disclosed by Dr.

Shearer are likely responsible for the continued gain in revenue.

10. Because clinical revenue continues to grow at nearly double the rate of patient volume

after Dr. Shearer's disclosure, it is likely that UMDSoM, UMMC, and FPI continue to

employ these overbilling methods.


*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a).  Dr. Shearer's federal cause of action for unlawful retaliation is authorized by 31 U.S.C. § 3730(h).

12. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because the Defendants transact business in this judicial district.

13. Venue is proper in this Court under 28 U.S.C. §1391(c) and 1395(a), and 31 U.S.C. § 3732(a) because the complained of illegal acts occurred within this judicial district and because the Defendants transact business this judicial district.

## PARTIES

14. Dr. Shearer is a citizen of the United States and a resident of Lutherville, Maryland.

15. Dr. Shearer began working for UMDSoM on July 1, 2011.  Like many UMDSoM professors, Dr. Shearer worked in one of the University of Maryland Medical System's member hospitals, the UMMC.  Within the UMMC, Dr. Shearer was Chief of the Division of Pediatric Hematology/Oncology ("the Division") in the University of Maryland Children's Hospital ("Children's Hospital").

16. Dr. Czinn terminated Dr. Shearer on June 14, 2012, but in order to honor the notification portion of her contractual agreement, he extended her employment to September 12, 2012, which was her last day at UMDSoM.

17. Defendant UMDSoM was established in 1807, is located in Baltimore, Maryland, and is the anchor for a large academic health center serving the state of Maryland.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

4

18. UMMC serves as the main teaching hospital for the UMDSoM and all of the UMMC physicians are UMDSoM employees.

19. UMMC is a component of the University of Maryland Medical System ("UMMS"), which is a non-profit corporation located in Baltimore.

20. FPI serves as the mechanism through which professional fee income is billed, collected, and distributed for the benefit of the faculty and the UMDSoM. FPI is a 501(c)(3) organization and has several locations in various UMDSoM hospitals.

## FACTUAL ALLEGATIONS

**Work History and Intense Management Pressure to Generate RVUs**

21. On or about July 1, 2011, Dr. Shearer began working for the UMDSoM as a non-tenured professor.

22. Dr. Shearer worked in one of the UMMS member hospitals, UMMC.

23. Within the UMMC, Dr. Shearer was Chief of the Division of Pediatric Hematology/Oncology in the University of Maryland Children's Hospital.

24. Dr. Czinn, Chairman of Pediatrics, immediately began pressuring Dr. Shearer to increase the Division's RVUs, which UMDSoM uses to measure the dollar amount of patient charges, including those billed to Medicare and Medicaid.

25. In 2008, Dean Albert Reece ("Dean Reece") demanded an across-the-board attainment of RVUs at the 75th percentile.

26. Dean Reece created color-coded report cards for individual faculty members based on RVU generation.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

27. Each faculty member had to incorporate Dean Reece's percentile demand into his or her sub-specialty, regardless of the nuances and particularities of each medical division.

28. Dean Reece's focus on RVUs created a hospital culture in which RVU achievement is at the forefront of defining success.

29. In March 2012, Pediatric Nephrology Division Chief Susan Mendley ("Dr. Mendley") instructed Dr. Shearer that all of her patients "should be level 5," meaning billed at the highest level.

30. Billing patient visits at the highest level, level 5, would increase RVUs.

31. During training, UMDSoM instructs its doctors that appropriate coding requires a distribution of billing levels because some patients have a quick "in and out" visit, others have an intermediate visit with a limited examination, while still others have a long visit with a detailed examination, review of labs and x-rays, and discussion of options.  The population of a doctor's patient encounters will vary within a given timeframe.

32. Some methods for increasing RVUs without grouping all patients into one billing level include seeing more patients, treating more complex patients, and capturing all available compliant charges.

33. Dr. Shearer utilized these methods of seeing additional patients, caring for more complicated patients, and capturing all available compliant charges.

34. Specifically, from about July 2011 to June 2012, Dr. Shearer recruited new patients, increased clinic hours, and improved efficiency through electronic scheduling, assigning a specific doctor for each patient, coordinating with Pediatric Anesthesia, and developing guidelines for the Infectious Disease Service for patients.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

35. From about July 2011 to June 2012, Dr. Shearer also worked to expand the Division and increase its visibility, including helping to create a new Cancer Survivor Program, writing a grant to establish a National Childhood Cancer Survivor Day, generating new clinical services at another member hospital, and designing strategy for faculty development.

36. Within nine months of her arrival, Dr. Shearer and another full-time physician in the Division, Doctor Teresa York ("Dr. York"), increased their RVUs to around the 65th percentile, greatly improving the Division's RVUs as a whole.

37. Despite Dr. Shearer's efforts to increase patient numbers and Department efficiency, and her improvement in the Division's RVU generation in less than one year, Dr. Czinn insisted that she expend even more effort to improve RVU numbers.

**Dr. Czinn Encourages the Division and Dr. Shearer to Work with Dr. Counts**

38. In or around January 2012, in a good faith effort to satisfy the RVU pressure at UMDSoM and UMMC, and noting that Dr. Czinn had appointed Doctor Debra Counts ("Dr. Counts"), Division Chief of Pediatric Endocrinology, to be the Vice-Chairman for Clinical Affairs of the Department of Pediatrics, Dr. Shearer asked Dr. Counts for advice on increasing RVUs.

39. In a January 6, 2012 email, Dr. Counts offered a method for RVU generation that included billing for complicated patients with codes not used in Pediatric Hematology/Oncology.

40. In or about February 2012, after informing Dr. Shearer that the Division's RVUs were still too low, Dr. Czinn encouraged Dr. Shearer to work with Dr. Counts because Dr. Counts stood out as an exemplary biller known for generating high revenue.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

7

41. In February or March 2012, Dr. Czinn asked Dr. Counts to review the Division's RVU generation as part of a Department of Pediatrics-wide effort.

42. In February or Mach 2012, Dr. Czinn sent an email to the Department encouraging UMDSoM physicians to work with Dr. Counts to increase their RVU generation.

43. On or around March 8, 2012, Dr. Counts led a meeting with Division staff including Dr. Shearer, Division Chief of Pediatric Gastroenterology Samra Blanchard ("Dr. Blanchard"), Registered Nurse Manager of the Pediatric Hematology/Oncology Clinic Monika Baumann, and Division Administrator Anne Kirstukas to reveal several of her billing strategies for increasing reimbursement, including payment from Medicaid.

*44.* During the March 8, 2012 meeting, Dr. Counts explained two ways, aside from employing codes not utilized in Pediatrics, in which she increased RVUs: (1) bill for medical record review and conversations with specialists prior to a visit and "adding these on" to the charges at the time of subsequent patient encounter; and (2) bill for case management which consists of using extended time codes to cover discussions with other providers without face-to-face involvement of the doctor with the patient at the time those occur.

**Dr. Shearer Follows Dr. Counts' Advice and a Medical Coding Supervisor Questions Dr. Shearer's Billing**

45. In March 2012, after experiencing continued RVU pressure from Dr. Czinn, Dr. Shearer decided to follow Dr. Counts' guidance for a handful of billing instances. Soon after doing so, Medical Coding Supervisor Sylvia Githui questioned Dr. Shearer's billing in one particular matter.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

8

46. Dr. Shearer immediately emailed Compliance Office Specialist Ellen McAvoy ("McAvoy") in late March 2012 regarding this issue, and McAvoy advised Shearer that she had overbilled.

47. McAvoy explained that the methods Dr. Counts' suggested for increasing RVUs were non-complaint. Specifically, she stated there is a face-to-face requirement for doctors to bill using the codes recommended by Dr. Counts.

**An Overview of UMDSoM's Billing System to Understand Why Dr. Counts' Methods of Increasing RVUs Are Not Compliant with Hospital Requirements**

48. UMDSoM bills using Evaluation and Management ("E and M") codes.

49. The level at which a patient is billed within the E and M structure depends upon the complexity of services, such as the diagnosis, the medical decision making, and the amount of time.

50. Most patient visits in the Division are billed at Level 3 or 4, with Level 5 being the highest code under the E and M system.

51. A Level 3 visit consists of 15 minutes of face-to-face time with the patient, a Level 4 is 25 minutes, and a Level 5 is 40 minutes.

52. Visits that fall in between coded level time periods are billed at the lower coding level, unless the complexity is such that medical decision making justifies a higher level.

53. Extended E and M time codes start beyond the Level 5, 40 minute time period, and must meet certain criteria. One requirement is that the extended time must be a face-to-face encounter with the patient.

54. In her March 27, 2012 reply to Dr. Shearer, McAvoy explained that "[b]illable time does not include co-ordination of care with primary service, but may be billable if face to face

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

9

(not phone or email) at bedside with other services" and must exceed the time already allotted for the code.

55. Additionally, a physician cannot bill extra time (over Level 5) to review records or research protocols in anticipation of or after a visit, as this does not satisfy the requirement for face-to-face time with a patient.

56. Dr. Counts' suggestion, provided from January to March 2012, to use extended time codes to cover a physician's discussions with other providers while neither was present with the patient does not comply with the hospital's billing requirements.

57. Dr. Counts' suggestion, provided from January to March 2012, for a physician to "add on" their medical record review to subsequent patient visits does not comply with the hospital's extended time code billing requirement because the physician was not present with the patient at the time of review.

58. Dr. Counts utilized the methods she suggested to others, such as "adding on" reviews to patient visits and using extended time codes to cover discussions with providers, and then submitted the codes to FPI so it could bill insurers, including Medicaid, for these services.

59. The process for bill submission from Pediatric Department physicians to FPI is as follows: after a doctor sees a patient in clinic or in the hospital, he or she writes a note consisting of the patient's history, the exam performed, and the review of relevant information (i.e., labs, x-rays, etc), all on a given date of service.

60. After writing the visit note, the physician determines the level of service using appropriate E and M codes based on the contents of the note and length of time.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

61. Physicians understand that the note and bill they submit to FPI must meet compliance standards because UMMC communicates this concept to the physician during training when he or she first arrives to the hospital.

62. Once a physician adds the E and M codes to the note, the physician either: (1) turns in the paper note and bill with the code to a Divisional Administrative Assistant, who submits copies of the note and billing sheet to the Pediatric Billing Office within FPI, or (2) electronically submits the note and bill with the code.

63. FPI then generates the claim to the insurer, which for Pediatrics includes Medicaid.

64. FPI handles all of the UMMC billing and therefore other hospital Departments, including ones that bill Medicare, utilize a process similar to Pediatrics.

**Dr. Shearer Continues to Disclose Dr. Counts' Practices and Compliance Further Questions These Methods**

65. On or around March 29, 2012, Dr. Shearer forwarded to McAvoy a January 6, 2012 email from Dr. Counts in which Dr. Counts explained the billing strategy she would employ if she received complicated testing back on a day she did not see a patient (i.e. when the E and M codes could not be used) and stated she would "synthesize those results into an interpretation and bill."

66. In this January 6, 2012 email, Dr. Counts claimed that for on particular patient she was "able to use the path code that includes review of clinical chart, when I did the interpretation of the GH stim test."

67. On March 29, 2012, McAvoy responded to Dr. Shearer that McAvoy would "still have to question if her [Dr. Counts'] documentation supports" the 80502 code she used.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

11

68. McAvoy also stated in her March 29, 2012 email that if Dr. Counts' explanation of the code she utilized for her test interpretation was the entirety of her claim, it "does not meet medical necessity."

**Dr. Shearer Informs Compliance and Billing of Possible Department-Wide Non-Compliance**

69. In a March 28, 2012 email Dr. Shearer informed McAvoy and Director of Compliance and Coding Edith Sunderland ("Sunderland") that she and Dr. Counts had had several informal meetings, a formal Division meeting, and corresponded over email regarding the use of extended codes, complicated patient billing, and "remote" coordination of care.

70. On March 30, 2012 Dr. Shearer informed McAvoy via email that she had questioned Dr. Counts' billing practices, had refrained from using her suggested methods in most instances, and had sent the examples of Dr. Counts' coding mechanisms to Compliance because Dr. Counts was informing other Pediatrics faculty of how to utilize these methods.

71. In or around March 30, 2012, Dr. Shearer also forwarded to Compliance a January 23, 2012 email from Dr. Counts stating that billing "boils down to how much time she actually spent both face to face and doing case management that day (including all non-trainees she needed to talk to)…then you document that and do time-based billing…then you add the extended codes."

72. Dr. Czinn encouraged Dr. Counts to provide verbal and written guidance to individual physicians as well as to provide recommendations for the Department in general regarding code utilization and RVU maximization.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

12

**Compliance and Billing Approach Dr. Counts, Dr. Shearer Reveals Concerns Regarding a Grant, and Dr. Counts Informs Dr. Shearer that Discussing Issues in the Department is "Unwise"**

73. In or around April 2012, Compliance and Billing approached Dr. Counts to discuss what Dr. Shearer had revealed regarding Dr. Counts' coding practices.

74. In an April 11, 2012 email, Dr. Counts admitted to Dr. Shearer that she had been engaging in these billing practices for "some years" and that she had never received negative feedback on her quarterly audit reports.

75. In mid-April, Sunderland met separately with Dr. Shearer and Dr. Counts to discuss Dr. Counts' coding practices and her suggestions to other physicians to utilize these methods.

76. In mid-April, during Dr. Shearer's meeting with Sunderland, Dr. Shearer informed Sunderland that she also had ethical misgivings regarding a Children's Cancer Foundation grant that Dr. Czinn submitted in Spring 2012.

77. Dr. Shearer explained to Sunderland during their mid-April meeting that Dr. Czinn had appointed Dr. York and a doctor from Pediatric Gastroenterology as investigators for the Children's Cancer Foundation grant; however, Dr. York did not write the grant and the Pediatric Hematology/Oncology and Gastroenterology administrators were unaware of this grant, although they oversee such items when doctors from their Divisions are appointed.

78. Dr. Shearer informed Sunderland in the mid-April meeting that when she and Kirstukas spoke with Director of Pediatric Development Jennifer Summers ("Summers") to discuss Dr. Czinn's involvement with this grant and to clarify grant procedures, Kirstukas stated that she was "very concerned."

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

79. After Dr. Shearer explained her apprehension regarding Dr. Czinn and the Children's Cancer Foundation grant to Sunderland in their mid-April meeting, Sunderland stated that "this doesn't smell good."

80. On or around April 27, Dr. Counts emailed Dr. Shearer stating that while Dr. Shearer was unsatisfied with "a number of issues," she should not discuss them within the Department as it is "unwise."

81. In the same email, on or around April 27, Dr. Counts stated that if Dr. Shearer did want to discuss any "issues," she should do so with Dr. Counts, Dr. Czinn, or the Departmental Administrator, Connie Grossart.

**Dr. Czinn Terminates Dr. Shearer**

82. On June 14, 2012, Drs. Czinn and Counts met with Dr. Shearer, and Dr. Czinn fired Dr. Shearer.

83. Dr. Czinn did not provide Dr. Shearer with a reason for the termination.

84. A security guard was in Dr. Czinn's waiting room prior to his termination meeting with Dr. Shearer and a Human Resources representative, Mary Greul ("Greul"), was in a back suite of Dr. Czinn's Office.

85. After Dr. Czinn fired Dr. Shearer, Greul stripped Dr. Shearer of her identification badge, keys, and pager and then escorted her out of the building.

86. After Dr. Czinn terminated Dr. Shearer, UMMC denied Dr. Shearer access to her computer, on which she had intellectual property.

87. After Dr. Czinn fired Dr. Shearer, UMMC denied Dr. Shearer access to her email, which contained the contact information of her professional colleagues.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

14

88. Dr. Czinn, in order to satisfy a contractual notification requirement, extended Dr. Shearer's employment until September 12, 2012; however, during this three-month period UMMC prohibited Dr. Shearer from engaging in her clinical duties and instead assigned her to conduct research at home.

89. In or around June 2012, UMMC removed Dr. Shearer's information from the UMMC's website while her appointment was still active.

90. Between June and September 2012, UMMC informed callers, colleagues, students, and patients wishing to contact Dr. Shearer that she no longer worked at UMMC.

**Dr. Shearer Alerts UMD Officials of Her Recent Whistleblowing and Retaliation**

91. While relegated to an at-home research assignment for the remainder of her appointment, Dr. Shearer appealed her termination on June 21, 2012 to Dean Reece, University President Jay Perman ("President Perman"), Senior Vice President of Academic Affairs Bruce Jarrell ("Vice President Jarrell"), and Sunderland, outlining her numerous achievements and recent whistleblowing.

92. On July 11, 2012, in Dr. Shearer's meeting with Vice President Jarrell and Associate Dean for Academic Administration and Resource Management Gregory Robinson ("Associate Dean Robinson"), the Vice President admitted that he had met with Sunderland, who confirmed that overbilling had occurred, but stated that the "right things" had been done.

93. During the July 11, 2012 meeting, Associate Dean Robinson told Dr. Shearer that Dr. Czinn had terminated her because she had a "serious issue with leadership" and that her RVU attainment had only reached the 40th-50th percentile range.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

94. Associate Dean Robinson's statement that Dr. Czinn terminated Dr. Shearer because she had not obtained her first-year RVU goal of the 65th percentile seems implausible.

95. An hour or so before Dr. Czinn terminated Dr. Shearer on June 14, 2012, Dr. Shearer had reviewed her most recent RVU table with Kirstukas, which indicated that Dr. Shearer had obtained the first-year 65th percentile goal required by Dr. Czinn.

96. In or around September 2012, when Dr. Shearer spoke with David Mosca ("Mosca"), to whom the case eventually referred within Internal Audit, Mosca told Dr. Shearer that she had "something to be proud of" with her RVUs.

**Dr. Shearer's Continues to Appeal her Wrongful Termination**

97. On July 14, 2012, Dr. Shearer sent another appeal letter to President Perman, Dean Reece, Vice President Jarrell, Associate Dean Robinson, and Sunderland to rebut Dr. Czinn's allegation that she had "serious issues with leadership."

98. In the July 14, 2012 appeal letter, Dr. Shearer highlighted her numerous achievements and stated that the likely reason UMDSoM did not renew her position was not because she had "serious issues with leadership" but rather because she refused to follow non-compliant billing practices and reported the non-compliant practices to the Compliance Office.

99. In the July 14, 2012 appeal letter, Dr. Shearer stated that instead of receiving protection for her good faith reporting and inquiry into the improper billing practices, UMDSoM terminated her.

100.    UMDSoM's termination of Dr. Shearer violated UMMS policy, which states that the "Medical System prohibits retaliation and…any person who lawfully reports

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

16

information about actual or potential violations of the FCA, may not be retaliated
against, demoted, suspended, threatened."

101.     In the July 14, 2012 appeal letter, Dr. Shearer also indicated that the non-
compliant billing practices had likely been ongoing for years and that UMD's audit
mechanism had failed to stop these non-compliant submissions, especially because Dr.
Counts stated that she had been utilizing such methods for "some years" in her April
2012 email.

**Dean Reece's Response**

102.     Dean Reece responded to Dr. Shearer's second appeal letter on July 20, 2012.

103.     On July 30, 2012, Dr. Shearer replied to Dean Reece's July 20, 2012 letter, noting
four key inaccuracies and omissions in his letter.

104.     First, Dean Reece disqualified Dr. Shearer's role as a whistleblower in his July
20, 2012 letter by downplaying her disclosure to the Compliance Office, stating Dr.
Shearer's disclosure was a mere Departmental request to clarify "guidelines that had been
misinterpreted."

105.     Between March and April 2012, the Compliance Office found Dr. Counts' coding
methods to be non-compliant practices that led to overbilling, not misinterpretation of
guidelines.

106.     In July 2012, Vice President Jarrell admitted that Compliance had investigated the
matters Dr. Shearer disclosed, found overbilling, and as a result, insurance adjustments
were "in the process of being made."

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

17

107.     Second, Dean Reece stated in his July 20, 2012 letter that "Sunderland did not

consider this matter to be a whistleblower action complaint attributable to [Dr. Shearer],

partly because [Dr. Shearer] copied Dr. Czinn on [her] initial e-mail with the compliance

office," and thus the Compliance Office considered this to be a request for clarification

by the Department.

108.     Dr. Shearer did not copy Dr. Czinn on her March 27 email to Compliance

Specialist McAvoy; Dr. Shearer only copied Kirstukas, the Administrator.

109.     In Dr. Shearer's March 28 email to Billing and Compliance, she specifically

requested confidentiality in her disclosure of Dr. Counts' billing methods because Dr.

Shearer feared reprisal from Drs. Czinn and Counts.

110.     Third, Dean Reece's July 12, 2012 letter does not clarify: (1) how far back

UMDSoM, UMMC, and/or FPI went in auditing Dr. Counts' claims, (2) whether

UMDSoM, UMMC, and/or FPI surveyed bills from providers other than Dr. Counts, (3)

whether UMDSoM, UMMC, and/or FPI surveyed departments other than Pediatrics, or

(4) whether insurers, including Medicaid, actually received any of the refunds.

111.     Dean Reece's one-page July 20, 2012 letter states that Dr. Counts had "accepted

fully the recommendations of the compliance office and appropriate educational materials

on billing coding were distributed to the Department" and that "insurance

adjustments…are already in the process of being made."

112.     Dean Reece's July 20, 2012 letter provided no accountability statement as to how

UMDSoM would tighten the oversight process and audit mechanisms in the future to

prevent further false claim submissions.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

113.    President Perman, to whom Dr. Shearer appealed, has a statement posted on the UMD Office Of Planning and Accountability website that those at the University must "effectively manage risks that may impact our...compliance" and that the University "program will serve to encourage increased awareness of risk in decision-making at every level throughout our institution."

114.    Fourth, Dean Reece's July 20, 2012 letter purported that UMDSoM terminated Dr. Shearer because her "leadership as division head did not prove to be a good fit for the Department;" this is an implausible reason for Dr. Shearer's termination.

115.    Within six months of her July 2011 arrival, Dr. Shearer helped to restore membership with the Children's Oncology Group, which Dr. Czinn had defined as the Division's key issue.

116.    Between July 2011 and June 2012, Dr. Shearer expanded the Division's services and visibility, improved efficiency, increased clinic hours, recruited new patients, and taught at the UMDSoM.

117.    Between June and July 2012, Dr. Shearer's colleagues and residents sent several messages to her stating how much they appreciated Dr. Shearer's efforts within UMMC and UMDSoM, including statements that "this program will suffer greatly by your absence" and "I was so tremendously disappointed to hear you had left University of Maryland...you were such a wonderful clinician and the quality of education all of the residents and medical students received from you was unparalleled by anyone in the entire department."

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

19

118.    Between July 2011 and June 2012, Dr. Shearer was elected to both the UMDSoM

Faculty Council as an alternate member and the Executive Committee of the Sub-Board

of Pediatric Hematology/Oncology of the American Academy of Pediatrics, and

appointed to both the Pediatric Sub-Committee of the Oncology Drug Advisory

Committee of the Food and Drug Administration and the National Institutes of Health

Best Pharmaceuticals for Children Act Working Group.

119.    Rather than rewarding Dr. Shearer for her achievements and good faith

whistleblowing, UMDSoM stated that Dr. Shearer was "not a good fit," that she "had

serious issues with leadership," and/or that she did not reach her RVU goals.  UMDSoM

terminated her, cut off access to her computer and email, and prohibited her from

completing clinical duties within the Children's Hospital.

**Further Disclosure of Non-Compliant Billing Methods and Dr. Shearer's Last Day**

120.    On August 4, 2012, Dr. Shearer wrote to University Chancellor and CEO William

Kirwan ("Kirwan"), the Board of Regents of the University of Maryland ("Board"), and

the Board of Visitors of the UMDSoM, recounting the events of the past few months and

providing supporting exhibits.

121.    On August 13, 2012, Janice Doyle ("Doyle"), Chief of Staff to the Chancellor and

Secretary to the Board, responded to Dr. Shearer, stating that due to the nature of the

allegations, she had referred the matter to UMD Internal Audit and the MD AG.

122.    On August 23, 2012, Dr. Shearer sent a letter to Kirwan, Doyle, and Board

Chairman James Shea describing the situation in further detail.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

20

123.    On September 7, 2012 Mosca from Internal Audit called Dr. Shearer to discuss the overbilling issues and Dr. Shearer then sent him a summary of the situation and information linking her whistleblowing activities to her termination.

124.    On September 8, 2012, Mosca called Dr. Shearer to review the information she had emailed him.

125.    During the September 8, 2012 call with Dr. Shearer, Mosca indicated that the MD AG's Office was investigating the overbilling allegations.

126.    On September 10, 2012, Dr. Shearer followed up with Kirwan and the Board in a letter, further describing the situation and referencing her conversations with Mosca.

127.    While the Internal Audit and MD AG investigations were still ongoing, Dr. Czinn reaffirmed Dr. Shearer's termination in a September 11, 2012 letter.

128.    In the September 11, 2012 letter, Dr. Czinn stated that while he understood that the MD AG and Internal Audit were reviewing the non-renewal of her faculty appointment, that the terms of the June 14, 2012 non-renewal letter remained in effect, and that Dr. Shearer's last day was September 12, 2012.

129.    On February 12, 2013, following an inspection, UMDSoM affiliated St. Joseph Hospital lost Medicare certification after UMMS purchased it on December 1, 2012.

## COUNT I

**UMDSoM Knowingly Presented False or Fraudulent Claims for Payment to the United States in Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)**

130.    Dr. Shearer realleges and incorporates the allegations set forth above as though fully alleged therein.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

131.     By virtue of the acts described above, UMDSoM knowingly presented or caused

to be presented to the United States Government false or fraudulent claims for payment

or approval under the federally-funded Medicaid and Medicare programs in violation of

31 U.S.C. § 3729(a)(1).

132.     UMDSoM engaged in fraudulent conduct when its professor(s), who worked as

physician(s) in its member hospital(s), submitted claims containing upcoded bills and/or

bills for non-reimbursable services to FPI, which subsequently billed Medicaid and/or

Medicare.

133.     UMDSoM did not render services as claimed to Medicaid when Dr. Counts, a

UMDSoM professor, submitted to FPI claims which contained extended time codes for

services at UMMC that did not meet the face-to-face patient visit requirement of the

extended time codes.

134.     UMDSoM did not render services as claimed to Medicaid when Dr. Counts, a

UMDSoM professor, submitted claims to FPI which utilized complicated codes not

applied in Pediatrics for services at UMMC.

135.     UMDSoM billed Medicaid for non-reimbursable services when Dr. Counts, a

UMDSoM professor, improperly "added on" reviews prior to or following patient visits

and then synthesized those into bills she submitted to FPI.

136.     UMDSoM promoted the use of upcoded bills and/or bills for non-reimbursable

services when Dr. Czinn, a UMDSoM professor, encouraged other UMDSoM professors

to follow Dr. Counts' questionable billing mechanisms and asked her to review the

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

22

Oncology/Hematology Division's RVU generation as part of a Department of Pediatrics-wide effort.

137.     UMDSoM promoted the use of improper billing when Dr. Czinn, UMDSoM professor, endorsed the RVU-generation methods of Dr. Blanchard, also a UMDSoM professor, to Dr. Shearer as Dr. Blanchard often had disputes with Compliance and Billing over codes and charges.

138.     UMDSoM created a culture in which it placed tremendous pressure on UMDSoM physicians to satisfy RVU obligations in any manner possible when UMDSoM Dean Reece demanded an across-the-board attainment of RVUs at the 75th percentile, produced RVU report cards for each professor/doctor, and made RVU generation the key measurement of success.

139.     UMDSoM was both aware, or should have been aware, of the potential for widespread improper billing and responsible for stopping it as UMDSoM employs the FPI Compliance and Billing offices.  UMDSoM has failed in this capacity because Dr. Counts has billed using her questionable methods for "some years" and had never received a negative audit.

140.     Given its lack of audit oversight, as well as UMDSoM's responsibility for other physicians throughout UMMC and other member hospitals who submit claims to FPI, UMDSoM likely failed to stop other instances of false claims that were sent to Medicaid and Medicare.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

23

141.     The United States, unaware of the falsity of the claims and/or statements made by

UMDSoM and in reliance on the accuracy thereof, paid Defendants for such false or

fraudulent claims, through reimbursement to FPI.

142.     By reasons of the acts and conduct of the UMDSoM in violation of 31 U.S.C. §

3729(a)(1), the United States has suffered actual damages, including the total amounts

paid in response to all such false or fraudulent claims for payment.  In addition, the

United States is entitled to recover civil money penalties, and other monetary relief as

deemed appropriate.

## COUNT II

**UMMC Knowingly Presented False or Fraudulent Claims for Payment to the United States
in Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)**

143.     Dr. Shearer realleges and incorporates the allegations set forth above as though

fully alleged therein.

144.     By virtue of the acts described above, UMMC knowingly presented or caused to

be presented to the United States Government false or fraudulent claims for payment or

approval under the federally-funded Medicaid and Medicare programs in violation of 31

U.S.C. § 3729(a)(1).

145.     UMMC engaged in fraudulent conduct when its physician(s) submitted claims

containing upcoded bills and/or bills for non-reimbursable services to FPI, which

subsequently billed Medicaid and/or Medicare.

146.     UMMC did not render services as claimed to Medicaid when Dr. Counts,

Division Chief of Pediatric Endocrinology and Vice-Chairman for Clinical Affairs of the

Department of Pediatrics at the UMMC, submitted to FPI claims which contained

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

extended time codes for services at UMMC that did not meet the face-to-face patient visit requirement of the extended time codes.

147.     UMMC did not render services as claimed to Medicaid when Dr. Counts, Division Chief of Pediatric Endocrinology and Vice-Chairman for Clinical Affairs of the Department of Pediatrics at the UMMC, submitted to FPI claims which utilized complicated codes not applied in Pediatrics for services at UMMC.

148.     UMMC billed Medicaid for non-reimbursable services when Dr. Counts, Division Chief of Pediatric Endocrinology and Vice-Chairman for Clinical Affairs in the Department of Pediatrics at the UMMC, improperly "added on" reviews prior to or following patient visits and then synthesized those into bills she submitted to FPI.

149.     UMMC promoted the use of upcoded bills and/or bills for non-reimbursable services when Dr. Czinn, Chairman of the Department of Pediatrics at UMMC, encouraged other UMMC physicians to follow Dr. Counts' questionable billing mechanisms and asked her to review the Oncology/Hematology Division's RVU generation as part of a Department of Pediatrics-wide effort.

150.     UMMC promoted the use of improper billing when Dr. Czinn, Chairman of the Department of Pediatrics at UMMC, endorsed the RVU-generation methods of Dr. Blanchard, Division Chief of Pediatric Gastroenterology at UMMC, to Dr. Shearer as Dr. Blanchard often had disputes with Compliance and Billing over codes and charges.

151.     UMMC supported the culture created by UMDSoM that placed tremendous pressure on physicians to satisfy RVU obligations in any manner possible when UMMC management, such as Dr. Czinn, furthered Dean Reece's demand of across-the-board

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

25

attainment of RVUs at the 75th percentile, utilized the RVU report cards Dean Reece

implemented, and made RVU generation the key measurement of success at UMMC.

152.     UMMC should have been aware of the potential for such fraud as the Compliance

and Billing Offices had objected, sometimes frequently, to UMMC physicians' billing

submissions and also taken measures to curtail the fraud, but UMMC failed in this

capacity because Dr. Counts had billed using her questionable methods for "some years"

and had never received a negative audit.

153.     Given UMMC's lack of audit oversight and its numerous Departments and

physicians outside of Pediatrics, UMMC likely failed to stop other instances of false

claims that were sent to Medicaid and Medicare.

154.     The United States, unaware of the falsity of the claims and/or statements made by

UMMC and in reliance on the accuracy thereof, paid Defendants for such false or

fraudulent claims.

155.     By reasons of the acts and conduct of the UMMC in violation of 31 U.S.C. §

3729(a)(1), the United States has suffered actual damages, including the total amounts

paid in response to all such false or fraudulent claims for payment.  In addition, the

United States is entitled to recover civil money penalties, and other monetary relief as

deemed appropriate.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

26

## COUNT III

**FPI Acted with Deliberate Ignorance and/or Reckless Disregard When it Presented False or Fraudulent Claims for Payment to the United States in Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)**

156.     Dr. Shearer realleges and incorporates the allegations set forth above as though fully alleged therein.

157.     By virtue of the acts described above, FPI knowingly presented or caused to be presented and/or acted with deliberate ignorance and/or with reckless disregard when it submitted to the United States Government false or fraudulent claims for payment or approval under the federally-funded Medicaid and Medicare programs in violation of 31 U.S.C. § 3729(a)(1).

158.     FPI billed Medicaid for services not rendered as claimed when it submitted Dr. Counts' bills containing extended time codes for services that did not meet the face-to-face patient visit requirement of the extended time codes.

159.     FPI billed Medicaid for services not rendered as claimed when it submitted Dr. Counts' bills that utilized complicated codes not applied in Pediatrics.

160.     FPI billed Medicaid for non-reimbursable services when it submitted Dr. Counts' synthesized bills that improperly "added on" reviews prior to or following patient visits.

161.     FPI's mission is to "continuously improve the financial and operational performance of our medical practices," and to conduct business "in compliance with all regulatory standards." Because Dr. Counts had been employing non-compliant billing tactics for "some years" without a negative audit, FPI disregarded its duties of ensuring that UMMC complied with regulatory standards.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

162.     FPI was aware of the potential for non-compliance because: (1) UMMS published a False Claims Act Education Policy for all of its employees, contractors and agents outlining efforts to detect and prevent fraud, and (2) coding staff, employed within the FPI office, had objected to some physicians' incorrect bill submissions, such as those from Dr. Blanchard.

163.     Because of its awareness of physician non-compliance and its function to stop such non-compliance, FPI should have been aware that Dr. Counts' claims contained non-reimbursable service charges and/or upcoded bills.

164.     FPI acted with deliberate ignorance and/or a reckless disregard for the truth in reviewing Dr. Counts' claims, allowing this to continue for some years, and sending these non-compliant bills to Medicaid.

165.     Because FPI oversees all UMMC and all UMDSoM affiliated hospital billing for patients receiving both Medicaid and Medicare coverage, and because Dr. Counts had been engaging in her non-compliant practices for "some years" and had never had a bad quarterly audit, UMMS and UMDSoM's audit mechanism experienced long-term failure and thus FPI likely submitted  false claims from other UMDSoM physicians to Medicare and Medicaid.

166.     The United States, unaware of the falsity of the claims and/or statements made by FPI and in reliance on the accuracy thereof, paid FPI for such false or fraudulent claims.

167.     By reasons of the acts and conduct of FPI in violation of 31 U.S.C. § 3729(a)(1), the United States has suffered actual damages, including the total amounts paid in response to all such false or fraudulent claims for payment.  In addition, the United States

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

28

is entitled to recover civil money penalties, and other monetary relief as deemed

appropriate.

## COUNT IV

### UMDSoM and UMMC Retaliated Against Dr. Shearer for Engaging in Acts Protected by the False Claims Act, 31 U.S.C. § 3730(h)

168.    Dr. Shearer realleges and incorporates the allegations set forth above as though

fully alleged therein

169.    As set forth above, and in connection with the foregoing scheme, UMDSoM and

UMMC knowingly submitted false claims for payment by the United States in violation

of the False Claims Act.

170.    Dr. Shearer engaged in activity protected under the False Claims Act by engaging

in lawful acts in the furtherance of a *qui tam* action under the FCA and other efforts to

stop Defendants' violation of the False Claims Act.

171.    Dr. Shearer engaged in protected activity by investigating the legality and

propriety of Defendants' conduct, such as when Dr. Shearer spoke with the UMDSoM

Billing and Compliance Offices to determine whether Defendants' practices were

acceptable and compliant.

172.    Dr. Shearer engaged in protected activity by making disclosures regarding the

Defendants' misconduct underlying the instant qui tam action, such as when Dr. Shearer

alerted Compliance, Billing, and several UMD officials of the non-compliant billing and

the possibility that this was widespread throughout UMDSoM, UMMC, and FPI.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

29

173.     Dr. Shearer engaged in protected activity by making disclosures regarding the
Defendants' misconduct underlying the instant qui tam action, such as Dr. Shearer's letter
to Chancellor Kirwan that resulted in Internal Audit and the MD AG being notified of
these non-compliant actions.

174.     Dr. Shearer's investigation and disclosures led in part to the instant *qui tam*
action.

175.     Dr. Shearer is an "employee," UMDSoM is an "employer," and UMMC is an
"employer" as the terms defined by the False Claims Act.

176.     UMDSoM and UMMC terminated Dr. Shearer.

177.     Dr. Shearer's protected activity motivated, at least in part, UMDSoM and
UMMC's decision to terminate Dr. Shearer.

178.     To redress the harms she has suffered as a result of the acts and conduct of the
UMDSoM and UMMC in violations of 31 U.S.C. § 3730(h), Dr. Shearer is entitled to
damages including two times the amount of back pay, interest on back pay, and any other
damages available by law including litigation costs and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, the Relator Patricia Shearer, acting on behalf of and in the name of the United
States of America, and on her own behalf, prays that judgment be entered against Defendants for
violation of the False Claims Act as follows:

(a) In favor of the United States against the Defendants for treble damages to the federal
government from the submission of false claims, and the maximum civil penalties for
each violation of the False Claims Act;

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

(b) In favor of the Relator for the maximum amount pursuant to 31 U.S.C. § 3739(d) to include reasonable expenses, attorney fees, and costs incurred by the Relator;

(c) For all costs of the False Claims Act civil action; and

(d) In favor of the Relator and the United States for further relief as this court deems just and equitable.


Respectfully submitted,


_____

R. Scott Oswald, DMD Bar No. 25391
David L. Scher, DMD Bar No. 17187
The Employment Law Group, P.C.
888 17th Street, N.W., Suite 900
Washington, D.C. 20006
(202) 261 – 2810
(202) 261 – 2835 (facsimile)
soswald@employmentlawgroup.com
dscher@employmentlawgroup.com
*Counsel for Plaintiff-Relator*


## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Dr. Shearer demands a jury trial.


*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via UPS,

on this Eighth day of April 2013, upon:

> Eric Holder, Esq.
> Attorney General of the United States
> Office of the Attorney General, Civil Division
> U.S. Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, DC  20530-0001
>
> Roann Nichols, Esq.
> Assistant U.S. Attorney
> District of Maryland
> 36 S. Charles Street, 4th Floor
> Baltimore, MD  21201

_____
David L. Scher

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Shearer v. University of Maryland School of Medicine, et al.*